UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -:
NORBERTO MERCADO,                        :    15 Civ. 2283 (JCF)
                                         :
              Plaintiff,                  :    MEMORANDUM
                                         :    AND  ORDER
     - against -                          :
                                         :
CAROLYN W. COLVIN, Acting                 :
Commissioner of Social Security,          :    ┌─────────────────────────┐
                                         :    │ USDS SDNY               │
              Defendant.                   :    │ DOCUMENT                │
- - - - - - - - - - - - - - - - - -:          │ ELECTRONICALLY FILED    │
JAMES C. FRANCIS IV                            │ DOC #: _____  │
UNITED STATES MAGISTRATE JUDGE                 │ DATE FILED: 7/13/16     │
                                              └─────────────────────────┘

     The plaintiff, Norberto Mercado, seeks review under 42 U.S.C.

§ 405(g) of a determination by the Commissioner of Social Security

(the "Commissioner") denying his application for Disability

Insurance Benefits ("DIB").   The parties consented to proceed

before me for all purposes pursuant to 28 U.S.C. § 636(c), and now

cross-move for judgment on the pleadings under Rule 12(c) of the

Federal Rules of Civil Procedure.   For the reasons that follow,

the plaintiff's motion is granted, the Commissioner's motion is

denied, and the case is remanded to the Social Security

Administration ("SSA") for further proceedings consistent with

this opinion.

Background

     A.   Personal History

     Mr. Mercado was born on April 13, 1966.   (R. at 96, 242).[1]

_____

     [1] "R." refers to the administrative record filed with the

He completed high school in Puerto Rico and now lives with his wife and two children in Beacon, New York. (R. at 96, 214, 244, 254). The plaintiff worked as a factory machine operator from 1988 until January 2011, when he fell from a catwalk. (R. at 97-99, 246, 301). Since then, he has not returned to work, except for a four-month period during which he performed clerical duties part-time. (R. at 96, 117-18).

    B.   <u>Medical History</u>

        1.   <u>Disability Report</u>

At the time of his application, Mr. Mercado was forty-six years old, five feet and ten inches tall, and weighed two hundred and twenty-eight pounds. (R. at 245). His back impairment, neck impairment, head trauma, and right shoulder injuries caused pain that limited his ability to work, sleep, concentrate, and remember things. (R. at 245, 255, 261-62). Mr. Mercado characterized the pain in his right shoulder, arm, elbow, back, and head as "sharp" and "constant" (R. at 262-63), and his daily headaches as "stabbing" (R. at 265). He took Percocet and Soma,[2] which provided relief for one hour but made him nauseous. (R. at 263-64). He

---

Commissioner's answer.

    [2] Soma is a skeletal muscle relaxant used to treat pain and stiffness from muscle spasms. <u>See</u> U.S. National Library of Medicine, <u>Carisoprodol</u>, Micromedex Consumer Medication Information, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009466/?report=details (March 1, 2016).

also attended physical therapy and stretched at home. (R. at 264).

Asked to describe his daily activities, the plaintiff stated he would "wash dishes sometimes," but was unable to do other house or yard work because he experienced too much pain. (R. at 257). He went outside twice a day, and could drive, but "only [] short distances." (R. at 257-58). He shopped for groceries accompanied by his wife and children. (R. at 258). He also reported talking with others on a daily basis, going to church on a weekly basis, and occasionally going to his children's school. (R. at 259).

Mr. Mercado stated that he could no longer "work, play sports, [or] lift greater than 5 lbs" because of injuries. (R. at 255). He could stand for ten to fifteen minutes, sit for ten minutes, walk one block, and climb stairs slowly. (R. at 259-60). He experienced back pain when he kneeling and got dizzy after kneeling or squatting. (R. at 260). Pain in his right arm made reaching and using his hands difficult, and his grip was sometimes weak. (R. at 260). The only area of personal care in which the plaintiff reported no problem was feeding himself. (R. at 256). He had a hard time dressing, bathing, and grooming due to his inability to lift his right arm, and had trouble using the toilet because it was difficult to bend and he became dizzy when rising. (R. at 255-56). Additionally, he was irritable and had trouble getting along with his wife and children. (R. at 259).

3

>        2.   Emergency Treatment and Diagnostic Tests

>             a.   Saint Francis Hospital

On January 19, 2011, after falling eight to ten feet from a catwalk, Mr. Mercado was admitted to Saint Francis Hospital. (R. at 301). A cervical CT scan indicated mild to moderate degenerative changes and spondylosis,[3] mild central disc bulge at C2-C3, mild disc bulge osteophyte complexes[4] at C3-C4, C4-C5, C6-C7, and minimal disc bulge osteophyte at C5-C6, but no acute fracture or dislocation. (R. at 310). An x-ray of his lumbar spine showed grade one retrolisthesis[5] of L4 on L5, degenerative disc disease with disc space narrowing at the S1 vertebra, and mild spondylosis. (R. at 314). A thoracic x-ray revealed a T7 vertebral compression fracture of indeterminate age and a twelve percent height loss; however a subsequent chest CT scan did not show acute fracture. (R. at 306). Head, neck, abdomen, and pelvis scans were negative, and his physical examination was normal except

---

[3] Spondylosis refers to the stiffening and fusion of vertebral joints. Spondylosis, Mosby's Medical Dictionary ("Mosby's") (Elsevier Medical Publications, 9 ed. 2009), http://medical-dictionary.thefreedictionary.com/spondylosis (last visited July 7, 2016).

[4] Disc-osteophyte complex refers to intervertebral disc displacement associated with calcific ridges or ossification. David F. Fardon et al., Lumbar disc nomenclature: version 2.0, 14 Spine Journal 2525, 2539 (2014)

[5] Retrolisthesis is the backward slippage of a vertebra. Retrospondylolishesis, Dorland's Illustrated Medical Dictionary ("Dorland's") 1636 (32d ed. 2012).

for lumbar tenderness.  (R. at 301, 304-06, 313).

Mr. Mercado was diagnosed with a cerebral concussion with a loss of consciousness greater than two minutes, acute pain secondary to trauma, and lumbar strain.  (R. at 301).  He was discharged the following day with a prescription for pain medication and told he could engage in normal daily activities to the extent his pain permitted.  (R. at 301-02).

### b.   Orange Radiology Associates

An April 1, 2011, MRI of Mr. Mercado's right shoulder revealed degenerative and hypertrophic changes of the acromioclavicular joint[6] and a small joint effusion.[7]  (R. at 348).  These findings were described as "probably secondary to arthritis[;] [h]owever, an acute injury [could not] be completely excluded."  (R. at 348).

### c.   Dr. Hoon J. Park

On April 5, 2011, Dr. Hoon J. Park examined the plaintiff and conducted electrodiagnostic testing.[8]  (R. at 342-47).  Dr. Park

---

[6]  The acromioclavicular joint facilitates shoulder movement. See Questions and Answers about Shoulder Problems, National Institute of Arthritis and Musculoskeletal and Skin Diseases, http://www.niams.nih.gov/Health_Info/Shoulder_Problems/ (last visited July 5, 2016).

[7] Joint effusion refers to increased fluid in a joint cavity, which often occurs after trauma.  See Joint Effusion, Medical Dictionary (Farlex & Partners 2009), http://medical-dictionary.thefreedictionary.com/joint+effusion (last visited July 5, 2016).

[8]  "Electrodiagnostic testing encompasses a range of specialized tests, including nerve conduction studies (NCS) and

noted a positive Phalen's test,[9] somewhat hypoactive right-side deep tendon reflexes, atrophy of the shoulder girdle muscle and right upper arm, hand grip of thirteen kilograms on the right and thirty-one on the left, and unremarkable sensation to pinprick. (R. at 346). Dr. Park concluded that there were "no electrophysiological findings consistent with cervical radiculopathy, brachial plexus injury." (R. at 346).

### 3. Treating Sources

#### a. Downtown Physical Medicine & Rehabilitation

Mr. Mercado was treated by Dr. Stephen Levinson and Dr. Marc Levinson, physical medicine and rehabilitation specialists, between March 2011 and April 2013. At his initial examination with Dr. S. Levinson on March 17, 2011, the plaintiff complained of pain in his neck, right shoulder, and back, which "limit[ed] his ability to carry, exercise, and reach behind his back" and "cause[d] weakness, sleep disturbances, and sexual dysfunction." (R. at 336). Lying down, twisting, walking, and bending forward exacerbated the pain. (R. at 336).

Mr. Mercado's gait was normal, and he was able to squat fully,

---

needle electromyography (EMG), that are used to evaluate the conduction of electrical impulses down peripheral nerves." Stephen Kishner et al., Electromyography and Nerve Conduction Studies, Medscape (Oct. 9, 2015), http://emedicine.medscape.com/article/2094544-overview#showall.

[9] The Phalen's test is used to check for carpal tunnel syndrome. Test, Phalen's, Dorland's at 1896.

transition between sitting and standing with ease, and dress without difficulty. (R. at 337). His cervical muscles, spinal lordosis, and sensation were normal; however he had limited neck motion with pain upon movement, tenderness of the right paracervical, Erb's point, upper trapezius, and left paralumbar, trigger points[10] in the right paracervical and upper trapezius, and spasm on the right. (R. at 337-38). Straight leg raising ("SLR")[11] and Lasègue tests[12] were negative. (R. at 338). Mr. Mercado's upper extremities had normal ranges of motion except for the right shoulder, which was also tender to palpation. (R. at 338). His grip strength was forty-two pounds on the left and twenty-five on the right, and he had paresthesias[13] in both hands. (R. at 338).

---

[10] Trigger points are "discrete, focal, hyperirritable spots located in a taut band of skeletal muscle" that cause "persistent pain resulting in a decreased range of motion in the affected muscles," as well as "tension headache, tinnitus, temporomandibular joint pain, decreased range of motion in the legs, and low back pain." David J. Alvarez & Pamela G. Rockwell, Trigger Points: Diagnosis and Management, 65 American Family Physician 653, 653 (Feb. 2002).

[11] The SLR test assesses lumbar radiculopathy and nerve root irritation. See Test, straight leg-raising, Dorland's at 1900.

[12] The Lasègue test is a modification of the SLR that includes the dorsiflexion of the foot. Sign, Lasègue, Id. at 1713.

[13] "Paresthesia refers to a burning or prickling sensation that is usually felt in the hands, arms, legs, or feet . . . ." Paresthesia Information Page, National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm (last visited July 5, 2016).

Dr. S. Levinson also reviewed the plaintiff's spinal MRI, which "reveal[ed] a large disc bulge at L4-5," "a central herniation" at C6-7, and "a herniated nucleus pulposus without stenosis."[14]  (R. at 338).  After assessing traumatic cervical and lumbosacral spine pain syndrome with suspicion of cervical radiculopathy,[15] right bicipital tendonitis, and right shoulder derangement, he recommended physical therapy, prescribed five hundred milligrams of Naproxen, and advised Mr. Mercado to consider epidural steroids.  (R. at 338-39).  Dr. S. Levinson opined for workers' compensation purposes that the plaintiff was "partially disabled, but totally disabled for his job."  (R. at 339).

At a follow-up appointment on April 7, 2011, Dr. S. Levinson noted restricted cervical and right shoulder motion, as well as tenderness to palpation, and administered a trigger point injection.  (R. at 351).  He assessed traumatic cervical and lumbosacral spine pain syndrome with radiculitis,[16] right shoulder

--------

[14] "Herniated nucleus pulposus is a condition in which part or all of the soft, gelatinous central portion of an intervertebral disk is forced through a weakened part of the disk, resulting in back pain and nerve root irritation."  Herniated Nucleus Pulposus, MedlinePlus Medical Encyclopedia, https://www.nlm.nih.gov/medlineplus/ency/imagepages/9700.htm (last visited July 5, 2016).  Stenosis occurs when a duct or canal narrows abnormally.  Stenosis, Dorland's at 1769.

[15] Radiculopathy is a disease of the nerve roots resulting from nerve inflammation or impingement.  Radiculopathy, Dorland's at 1571.

[16] Radiculitis is the "inflammation of the root of a spinal

derangement, and myofascial pain.[17]  (R. at 351).  Dr. S. Levinson again concluded that Mr. Mercado was totally disabled for his current job and markedly disabled for any job, and specified the following restrictions: "no bending, lifting, squatting, overhead work[,] or lifting or manipulating any more than [ten] pounds." (R. at 352).

Mr. Mercado was treated at Downtown Physical Medicine & Rehabilitation approximately once a month for the next two years; starting in August 2011, he was seen by Dr. M. Levinson.  (R. at 349-52, 362-65, 392-93, 416, 436-47, 453-55, 462-64, 469-74, 502-04, 514-19, 532-37).  The plaintiff persistently reported significant, constant pain, which was only occasionally and partially mitigated by medication or physical therapy.  (R at 368, 390, 397, 402-04, 408-10, 470, 491, 500, 515, 519, 534, 537). Beginning in June 2011, he also experienced headaches and dizziness.  (R. at 390, 397, 403, 408-10, 500).  Except for one report from June 2012, which is discussed in greater detail below, the doctors' findings were consistent over this time.  Virtually

---

nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal."  <u>Radiculitis</u>, <u>Dorland's</u> at 1571.

[17] Myofascial pain syndrome refers to chronic muscular pain characterized by trigger points and is often associated with another musculoskeletal condition.  <u>Myofascial Pain Syndrome</u>, MD Guidelines, http://www.mdguidelines.com/myofascial-pain-syndrome (last visited July 5, 2016).

all noted an antalgic gait;[18] limited range of motion of the neck, right shoulder, cervical spine, and lumbar spine; trigger points; and tenderness to palpation, tightness, and spasm in the cervical paraspinals and upper trapezius muscles, especially on the right side. (R. at 369, 372-73, 375, 387, 390, 392, 397, 402-04, 408-10, 470, 491, 500, 515, 519, 534, 537). SLR tests were generally "equivocal," while Neer,[19] Hawkins,[20] and apprehension signs were positive. (R. at 369-370, 397, 402-04, 408-10, 470, 491, 500, 515, 519, 534, 537). Later reports also documented anterior joint line tenderness, "some supraspiatus atrophy," and decreased muscle strength, and indicated Mr. Mercado was suffering from reactive depression. (R. at 408-10, 470, 491, 500, 514-15, 519, 523, 527, 534, 537). Every report prescribed physical therapy, pain management, or medication, and many included referrals to specialists. (R. at 370-71, 376, 391, 393, 397, 402-04, 408-10, 470, 491, 500, 515, 519, 534, 537). Dr. S. Levinson and Dr. M.

---

[18] An antalgic gait is a limp that occurs as a result of counteracting or avoiding pain. Gait, antalgic, Dorland's at 753.

[19] The Neer test is used to "identify impingement of the rotator cuff." Neer test, Medical Dictionary, http://medical-dictionary.thefreedictionary.com/Neer+test (last visited July 5, 2016).

[20] The Hawkins test assesses "rotator cuff tendonitis or subacromial impingement." Hawkins test, Medical Dictionary (Farlex & Partners 2009), http://medical-dictionary.thefreedictionary.com/hawkins+test (last visited July 5, 2016).

Levinson always characterized the plaintiff as at least partially
disabled -- between seventy and one hundred percent impaired. (R.
at 335, 350, 363, 371, 376, 388, 391, 393, 397, 402-04, 408-10,
416, 470, 491, 500, 515, 519, 533-34, 537).

On August 18, 2011, Dr. M. Levinson recorded similar findings
-- paraspinal muscle tightness, tenderness, and spasm, and limited
range of motion -- and characterized Mr. Mercado as "70% impaired."
(R. at 397).  After a "detailed" discussion "with the [plaintiff]
[and] his casemanager," Dr. M. Levinson stated that the plaintiff
could return to light duty work for four hours a day with the
following additional restrictions: (1) standing and walking
limited to between one and four hours, with breaks, (2) lifting
limited to ten pounds, (3) no overhead activities, and (4) no
bending. (R. at 397).  However, at an appointment five weeks
later, Mr. Mercado reported that his pain had increased upon
resuming work, forcing him to take time off. (R. at 402).  Dr. M.
Levinson observed that the plaintiff's symptoms were exacerbated,
and noted that he would remain out of work for the next week. (R.
at 402).  In the following months, despite some interim relief
from physical therapy, Mr. Mercado's condition deteriorated and he
ultimately stopped working after an episode of dizziness on the
job. (R. at 403-04, 408).

Mr. Mercado saw Dr. M. Levinson twice in June 2012. (R. at

11

504-11, 513).  Treatment notes from June 14 -- characterized as an
"Initial Consultation" -- state that the visit was prompted by
right elbow discomfort and pain associated with a mass on the
plaintiff's right calf.  (R. at 505).  The plaintiff rose with
difficulty, his gait was antalgic, and heel and toe walking were
absent secondary to pain, but Dr. M. Levinson recorded normal range
of motion and muscle strength except for the right elbow and right
calf, ankle, and foot.  (R. at 506-11).  Dr. M. Levinson diagnosed
right lateral epicondylitis and right calf sprain with hematoma.
(R. at 507).  The record contains two follow-up notes dated June
28, 2012; one focuses only on the right elbow and calf (R. at 513),
while the other discusses Mr. Mercado's neck, back, and shoulder
in a manner consistent with all the other treatment records
preceding and following his June visits (R. at 504).

### b.   Dr. Andrew Linn

Dr. S. Levinson referred Mr. Mercado to Dr. Andrew Linn, an
anesthesiologist and pain management specialist.  (R. at 383).  On
April 11, 2011, Mr. Mercado reported feeling constant pain
(assessed between five and seven out of ten) in his neck and back,
which radiated into his upper extremities and through his legs,
respectively, as well as numbness, tingling, and weakness in his
right hand and leg.  (R. at 383).  Dr. Linn noted that MRIs from
February 2011 showed a left paracentral disc herniation at L4-5

and a right paracentral herniated protrusion without stenosis at C6/7.  (R. at 384).  An examination revealed tenderness to palpation over the lumbar facets, significant neck spasm, moderate back spasm, and bilateral lumbar facet loading pain.  (R. at 385). Mr. Mercado's gait, muscle strength, and deep tendon reflexes were normal, and SLR and FABER tests[21] were negative.  (R. at 384-385). Dr. Linn assessed cervical degenerative disk disease with radiculopathy, lumbar degenerative disk disease, and thoracic degenerative disk disease.  (R. at 386).  He recommended epidural steroid injections (R. at 386), which he administered at a follow up appointment on May 16, 2011 (R. at 389).  Although Mr. Mercado "tolerated the procedure well" (R. at 389), it did not provide him significant relief (R. at 392, 394, 396).  On August 3 and 31, 2011, the plaintiff reported high pain levels, numbness, tingling, and weakness in his right hand and leg, dizziness, high blood sugar levels, and severe headaches.  (R. at 394-95, 399).  On August 31, 2011, Dr. Linn referred Mr. Mercado for a surgical consult.  (R. at 399, 401).

Dr. Linn's reports to the Workers' Compensation Board contain an initial assessment of thoracic and lumbar intervertebral disk

---

[21] The FABER or FABERE (flexion, abduction, external rotation, and extension) test is used to identify hip arthritis or sacroiliac dysfunction.  Faber test, Medical Dictionary (Farlex & Partners 2009), http://medical-dictionary.thefreedictionary.com/FABER+test (last visited July 5, 2016).

displacement without myelopathy and cervical intervertebral disk disorder with myelopathy (R. at 354), and subsequent diagnoses of intervertebral disk disorder with myelopathy in both the cervical and lumbar regions.[22]  (R. 359, 427, 432).  He opined that Mr. Mercado was fifty percent impaired.  (R. 354, 427, 432).

c.  Dr. Surinder Jindal

At an August 10, 2011,[23] appointment with Dr. Surinder Jindal, a neurologist and pain management specialist, Mr. Mercado complained of headaches, dizziness, neck pain, and back pain.  (R. at 421).  His physical examination was normal and he was not in acute distress.  (R. at 421).  His neurological examination revealed normal muscle strength and gait, but decreased sensation in the right C5-C6 distribution and spastic trigger points in the cervical, trapezius, supraspinatus, and rhomboid muscles.  (R. at 421).  SLR was forty degrees on the right and sixty degrees on the left.  (R. at 421).  After assessing head injury, cervical sprain, lumbosacral sprain, and displacement of the thoracic

_____

[22] "Lumbar disc disorder with myelopathy refers to a disorder of the lumbar spine that results in compression of the lowest portion of the spinal cord (conus medullaris).  Myelopathy is an inclusive term referring to any disorder of the spinal cord." Lumbar Disc Disorder with Cauda Equina Syndrome, MD Guidelines, http://www.mdguidelines.com/lumbar-disc-disorder-with-myelopathy/definition (last visited July 6, 2016).

[23] Mr. Mercado indicated that he first saw Dr. Jindal on July 25, 2011 (R. at 248), but the administrative record contains no information about this visit.

14

intervertebral disk without myelopathy (R. at 419), Dr. Jindal increased the plaintiff's Zanaflex[24] and added a prescription of Anaprox DS[25] (R. at 421). He indicated that Mr. Mercado was one hundred percent impaired. (R. at 420).

Dr. Jindal's clinical findings over the following year largely tracked his initial observations, with the additional impressions of myofascial pain and cervicogenic headaches.[26] (R. at 425, 458, 461, 490). Mr. Mercado's right lateral flexion ranged from ten to twenty degrees and his flexion extension from twenty-five to thirty degrees. (R. at 425, 458, 461, 490). He consistently reported headaches and neck and back pain at a level between eight and ten out of ten. (R. at 425, 458, 461, 490). Dr. Jindal recommended pain management, including stretching, physical therapy, and muscle relaxants, and administered multiple

---

[24] Zanaflex, a skeletal muscle relaxant, relieves spasms. See U.S. National Library of Medicine, Tizandine, Micromedex Consumer Medication Information, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0012442/?report=det ails (March 1, 2016).

[25] Anaprox DS is a brand name for Naproxen. See U.S. National Library of Medicine, Naproxen, Micromedex Consumer Medication Information, PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011337/?report=det ails (March 1, 2016).

[26] Cervicogenic headaches originate from the cervical spine and are associated with neck pain and stiffness. See Phil Page, Cervicogenic Headaches: An Evidence-led Approach to Clinical Management, 6 International Journal of Sports Physical Therapy 254, 254-55 (Sep. 2011), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3201065/.

trigger point injections, which he described as "medically necessary considering the clinical status." (R. at 425, 458, 461, 490). Each report he submitted to the Workers' Compensation Board characterized the plaintiff as one hundred percent impaired, and several listed specific functional limitations. (R. at 423-24, 456-57, 459-60, 488-89).

### d.   Dr. Luis Villamon

The record contains seven hand-written notes from Dr. Luis Villamon, an endocrinologist who treated Mr. Mercado for diabetes. (R. at 528-30, 567-70). Although brief and partially illegible, they reflect several musculoskeletal examinations and track the plaintiff's complaints of neck and back pain, headaches, dizziness, stiffness, and numbness. (R. at 529-30, 567-70). A November 14, 2012, note "to whom may it concern" provides an overview of the plaintiff's physical injuries, including his MRI results, subjective complaints, and range of motion limitations. (R. at 530). Dr. Villamon wrote that Mr. Mercado was eighty-five percent disabled and a high risk for surgery due to his diabetes. (R. at 530).

Additional visits between December 2012 and June 2013 produced similar findings. Mr. Mercado consistently reported dizziness and pain in his neck, back, and right upper extremities, and an inability to lift his right arm above his shoulder or open

his right hand. (R. at 529, 567-70). On December 13, 2012, January 29, 2013, February 28, 2013, and March 15, 2013, Dr. Villamon documented limited range of motion. (R. at 528-29, 567-68). On February 28, he also documented lumbar tenderness on palpation. (R. at 567). On March 15, he observed right shoulder and right arm muscle atrophy and once again opined that Mr. Mercado was eighty-five percent disabled. (R. at 530).

        e.   Paul Elghazaly

    Between February 2011 and March 2012, the plaintiff received physical therapy from Paul Elghazaly, MPT. (R. at 561). The record contains two statements from Mr. Elghazaly: an examination narrative from January 24, 2012, and a physical residual functional capacity questionnaire dated June 28, 2013. (R. at 465-67, 561-65).

    On January 24, 2012, Mr. Mercado reported experiencing right shoulder, cervical, and lower back pain (assessed at a six out of ten), which was constant and made all functional activities difficult; he also stated that his ability to sit had "improved slightly," and that he was unable to lift, push, or pull "as much as usual" or fully participate in recreational activities. (R. at 465). A physical examination revealed a moderate loss of joint function at C2-T1; thoracic and lumbar trigger points; severe spasm of the cervical paraspinal muscles bilaterally; abnormal cervical

flexion, extension, and rotation bilaterally, all accompanied by pain; abnormal right shoulder flexion, extension, abduction, adduction, and rotation; muscle strength of between three and five (out of five); and positive right-side Spurling's,[27] Valsalva,[28] and Supraspinatus Press[29] tests.  (R. at 465-66).  Mr. Elghazaly diagnosed cervical spine pain and shoulder joint pain, noting that Mr. Mercado was "in an acute phase."  (R. at 466-67).

The June 28, 2013, physical residual functional capacity questionnaire contains a diagnosis of lower back pain, neck pain, and right shoulder derangement, with additional associated symptoms of stiffness and decreased range of motion.  (R. at 561).  Mr. Mercado's pain -- rated between eight and nine out of ten -- was persistent and exacerbated by prolonged sitting and standing. (R. at 561-62).  Mr. Elghazaly listed severely reduced range of

---

[27]   The Spurling's test evaluates cervical nerve root impingement in patients with neck pain or pain radiating below the elbow.  Spurling test, Farlex Partner Medical Dictionary (Farlex 2012), http://medical-dictionary.thefreedictionary.com/Spurling+test (last visited July 6, 2016).

[28] The Valsalva test "checks the functioning of your autonomic nervous system."  Orthostatic hypotension (postural hypotension), Mayo Clinic, www.mayoclinic.org/diseases-conditions/orthostatic-hypotension/basics/tests-diagnosis/con-20031255 (last visited July 6, 2016).

[29] Jobe's Supraspinatus test, also known as the "empty can" test, evaluates rotator cuff function and strength.  Shoulder Physical Exam, eORIF, http://eorif.com/shoulder-physical-exam (last visited July 6, 2016).

motion in the right shoulder, C/5, and L/5 as clinical findings and objective signs of the plaintiff's condition. (R. at 561). He described Mr. Mercado's prognosis as "guarded" and his functional capacity in a competitive work environment as "severely limited." (R. at 561-62). Mr. Elghazaly opined the plaintiff could walk one to two blocks without rest, sit continuously for one hour, stand for thirty minutes, sit and stand or walk for less than two hours total in an eight-hour work day, and lift up to twenty pounds occasionally, but that he could not bend or twist at the waist or use his arms for reaching. (R. at 562-65). He wrote that Mr. Mercado needed a job that would permit him to walk for five minutes every half hour, shift positions at will, and take additional unscheduled five-minute rest breaks two to three times per day. (R. at 563). Mr. Elghazaly stated that the plaintiff's impairments were likely to produce good and bad days and result in three days of absence monthly. (R. at 564-65).

### 4.   Examining Consulting Physicians

#### a.   Dr. Ronald Krinick

Dr. Ronald Krinick, a shoulder specialist, examined the plaintiff on December 20, 2011. (R. at 450-52). Mr. Mercado reported pain in his head, neck, back, and right shoulder (assessed at eight out of ten), accompanied by numbness, swelling, and weakness. (R. at 450). His gait was slow but he was able to

remove his clothing and sit on the exam table. (R. at 451). Examination of the right shoulder revealed limited range of motion, tenderness to palpation at the supraspinatus insertion and acromioclavicular joint, decreased motor strength at the biceps tendon and normal strength at the supraspinatus and on rotation, positive cross-body[30] and Hawkins impingement tests, and negative Neer, bow,[31] and shoulder instability tests. (R. at 451).

Dr. Krinick diagnosed right shoulder acromioclavicular joint arthropathy, biceps tendonitis, and rotator cuff impingement, and recommended physical therapy, as well as a spinal surgery consult. (R. at 452). He opined for workers' compensation purposes that the plaintiff was fifty percent impaired, but could return to light duty work for four hours per day, with no overhead activity or heavy lifting. (R. at 452).

b.   Dr. Amy Weiss-Citrome

Dr. Amy Weiss-Citrome, a physiatrist, conducted an independent medical examination of Mr. Mercado for workers'

---

[30] The cross-body adduction test is used to determine symptomatic acromioclavicular joint osteoarthritis or chronic sprain. See Kelton M. Burbank et al., Chronic Shoulder Pain: Part I. Evaluation and Diagnosis, 77 American Family Physician 453, 455 (Feb. 2008), http://www.aafp.org/afp/2008/0215/p453.html.

[31] The bowstring test identifies sciatic nerve (radicular) pathology. Bowstring test, Segen's Medical Dictionary (Farlex, Inc. 2012), http://medical-dictionary.thefreedictionary.com/bowstring+test (last visited July 6, 2016).

compensation purposes on August 25, 2011.  (R. at 573).  The
plaintiff reported dizziness, fainting, pain, numbness, and
difficulty walking, bending, lifting, sleeping, and moving his
right arm and leg.  (R. at 574).  Dr. Weiss-Citrome's examination
revealed normal findings with respect to his wrists, elbows, hands,
and lower extremities; bicipital groove tenderness and positive
impingement of the right shoulder; "diffuse" and "moderate
tenderness but no muscle spasm" of the cervical and thoracolumbar
paraspinal musculature; limited thoracolumbar range of motion; and
negative SLR.  (R. at 574-75).

Dr. Weiss-Citrome stated that, although Mr. Mercado
complained of pain and barely moved during the examination, she
"saw more cervical range of motion as he moved around
the exam room."  (R. at 574).  Additionally, she noted that Mr.
Mercado's "voluntary guarding prevented bilateral shoulder range
of motion tests."  (R. at 575).  Remarking that there were
"insufficient objective findings to correlate with many of [the
plaintiff's] subjective complaints," Dr. Weiss-Citrome diagnosed
right shoulder contusion superimposed upon preexisting
degenerative joint disease, cervical strain/sprain, and lumbar
strain/sprain.  (R. at 576).  She opined that the plaintiff had a
mild partial disability, could presently return to work if he
avoided overhead work with the right arm and lifting more than 25

21

pounds, and could return to full duty work in two to three months.
(R. at 576).  She further noted that Mr. Mercado did not require
prescription medication and had "reached maximum medical
improvement for conservative care."  (R. at 576).  Finally, Dr.
Weiss-Citrome recommended an independent Functional Capacity
Evaluation. (R. at 576).

c.   Dr. Paul Jones

Dr. Paul Jones, an orthopedic surgeon, reviewed Mr. Mercado's
medical records and conducted two independent medical examinations
for workers' compensation purposes.  (R. at 543-46, 556-59).  On
February 13, 2012, Dr. Jones found "a marked decrease of cervical
motion in all planes," full left shoulder range of motion, and
limited right shoulder range of motion.  (R. at 557).  Mr.
Mercado's grip strength, reflexes, and sensation were normal. (R.
at 558).  His right upper extremities, thoracolumbar and
lumbosacral junctions, right sacroiliac joint area, and sciatic
notch were tender to palpation; shoulder impingement testing was
positive on the right; he exhibited limited forward flexion,
tilting, and twisting; and he "became somewhat dizzy" upon
movement. (R. at 557-58).  Dr. Jones diagnosed cervical and lumbar
syndromes, internal derangement of the right shoulder, and frozen
shoulder syndrome.  (R. at 558).  He opined that the plaintiff had
a temporary marked partial disability and was "not capable of

22

returning to full duty work," but could perform sedentary work for four hours a day if he remained seated and did not bend, lift, or reach.  (R. at 558).

On January 7, 2013, Dr. Jones recorded similar findings and also noted right side torticollis,[32] a somewhat elevated right shoulder, decreased grip strength on the right, positive SLR, diminishment of the left calf, and slightly positive Waddell's testing[33] in the lower back.  (R. at 543-45).  He diagnosed chronic cervical and low back pain and a frozen right shoulder.  (R. at 545).

### d.   Dr. Patrick Hughes

Dr. Patrick Hughes, a neurologist, reviewed Mr. Mercado's medical records and conducted two independent examinations for workers' compensation purposes.  (R. at 547-54, 578-83).  On December 4, 2012, Mr. Mercado reported experiencing daily severe headaches accompanied by a loss of vision in his right eye and occasional nausea and hyper-sensitivity to light and sound,

---

[32] "Torticollis is a condition in which the neck muscles cause the head to turn or rotate to the side."  U.S. National Library of Medicine, Torticollis, MedlinePlus Medical Encyclopedia, https://www.nlm.nih.gov/medlineplus/ency/article/000749.htm (last visited July 6, 2016).

[33] Waddell's signs are eight physical signs that indicate non-organic or psychological elements of chronic low back pain.  See David A. Fishbain et al., A Structured Evidence-Based Review on the Meaning of Nonorganic Physical Signs: Waddell Signs, 4 Pain Medicine 141, 141-42 (June 2003), http://painmedicine.oxfordjournals.org/content/4/2/141.

constant neck pain (ranging from mild to severe), and occasional tingling in his right hand. (R. at 548). He walked unaided and got on and off of the exam table without assistance. (R. at 552). He had normal cranial nerves; normal motor strength except for the right opponens pollicis muscle; negative SLR bilaterally, decreased sensitivity of the right thumb and index finger and all the fingers in his left hand; unresponsive arm, leg, and plantar reflexes; and limited range of motion of the lumbar and cervical spine. (R. at 552-53). Dr. Hughes assessed a mild head injury and acute cervical and lumbosacral strain, noting the lack of clinically significant findings on Mr. Mercado's imaging, EMG studies, and neurological examination. (R. at 553). He opined that the plaintiff was at "maximum medical improvement," had a mild partial disability, and could perform light duty work, with no sitting, standing, or walking for more than thirty minutes, and no lifting of more than twenty pounds. (R. at 553).

Dr. Hughes issued a second report on July 9, 2013, after reviewing additional medical records and conducting another examination. (R. at 578-83). Mr. Mercado stated he was "worse," constantly experiencing headaches and pain in his neck, right arm, mid-thoracic region, lower back, and right leg -- all of which he described as "severe" and assessed as between seven and nine out of ten. (R. at 578-79). He held his head in right lateral flexion

and his fingers flexed, was only able to abduct the right shoulder twenty degrees due to pain, had normal muscle strength except for the right oppenens pollicis muscle, had hypalgesia of the right hand and could not extend three of his fingers, and did not produce arm, leg, or plantar responses.  (R. at 580-81).  His complaints of shoulder and spinal tenderness were not associated with spasm. (R. at 581).  Dr. Hughes again diagnosed "a mild head injury and [] acute cervical and lumbosacral strain causally related to [Mr. Mercado's] work injury of January 19, 2011."  (R. at 581).  He opined that, absent neurological findings of radiculopathy or spinal cord dysfunction, the plaintiff's cervical disc herniation was unlikely to be the cause of his symptoms.  (R. at 581). Accordingly, Dr. Hughes concluded that Mr. Mercado's subjective complaints were not correlated with objective findings and that he could work "without restrictions."  (R. at 581).

5.   Non-Examining Medical Consultant

State agency medical consultant Dr. Gary Friedman provided a physical residual capacity assessment in connection with the reconsideration of Mr. Mercado's application.  (R. at 138, 477-83).  He opined that the plaintiff could lift or carry up to twenty pounds occasionally and up to ten pounds frequently; stand or walk for at least two hours and sit for six; occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally balance and

stoop; frequently kneel, crouch, and crawl; occasionally reach overhead; frequently feel with the right upper extremity; and push, pull, handle, and finger without limitation.   (R. at 478, 480).

Dr. Friedman relied on Mr. Mercado's CT scans, x-rays, MRIs, and nerve connection studies, as well as his limited range of motion, antalgic gait, and complaints of shoulder and low back pain.  (R. at 478-80).  He indicated that there was no treating or examining source statement regarding the plaintiff's physical capacities.  (R. at 482.)  He also noted that the severity of Mr. Mercado's symptoms and their alleged effect on his functionality were consistent with the totality of the evidence.  (R. at 482).

    6.   Dr. Jean Bachar[34]

The plaintiff submitted additional records to the Appeals Council from Dr. Jean Bachar, an orthopedist, dated January 2014 through January 2015.  (R. at 15-60).  Dr. Bachar consistently recorded muscle spasms, positive right shoulder impingement tests, and abnormal cervical and lumbosacral spine motion.  (R. at 15-16, 20-21, 30, 35-36, 44, 49, 54, 59-60).  Mr. Mercado reported pain at a level of seven out of ten and had difficulty moving from

---

[34] These records, which post-date the ALJ's decision as well as the Appeals Council's initial decision, were received by the Appeals Council after the plaintiff had commenced this action. (R. at 1).  In a letter dated May 4, 2015, the Appeals Council informed Mr. Mercado that it had reviewed the evidence and "concluded that no change in the prior action [was] warranted," and that "no further administrative action [would] be taken pending the court's review."  (R. at 1).

sitting to standing, and an abnormal gait. (R. at 15-16, 20-21, 25, 30, 35-36, 43-44, 53-54, 59-60). A September 9, 2014, note referenced MRI results revealing a central herniation at T3. (R. at 30). On several occasions, Dr. Bachar mentioned Mr. Mercado was receiving treatment for anxiety and depression. (R. at 15, 20, 25, 35, 54). Dr. Bachar diagnosed shoulder sprain, intervertebral lumbosacral disorder with radiculopathy, herniated disc at L4-L5, and cervicalgia, and opined that Mr. Mercado was eighty-five percent disabled. (R. at 16, 21, 25, 30, 36, 44, 49, 54, 60).

C.    Procedural History

Mr. Mercado applied for DIB on April 13, 2012, alleging an onset date of January 19, 2011. (R. at 213). His application was denied upon initial review and again on reconsideration. (R. at 137-38). He then requested a hearing before an Administrative Law Judge ("ALJ") (R. at 153), and, on July 9, 2013, appeared with counsel before ALJ Robert Gonzalez (R. at 89).

At the hearing, Mr. Mercado stated that he experienced daily headaches, pain in his neck, back, right shoulder, and right leg, and numbness and tingling in his right hand, and complained that his pain had gotten progressively worse. (R. at 99-100, 104, 107, 113-15). He further testified that he could not lift anything with his right arm, could not sit or stand for continuous periods

-- only about twenty to thirty minutes at time -- and could not walk for much longer than fifteen minutes. (R. at 106-07, 116).

A vocational expert, Donald Slive, also testified at the hearing. (R. at 119-28). The ALJ inquired about a hypothetical individual of the same age, education, and experience as Mr. Mercado who could frequently kneel, crouch, crawl; frequently flex, extend, and rotate the neck; frequently handle and finger objects with his dominant right hand; occasionally climb ladders, ropes, and scaffolds; occasionally stoop; and never work at unprotected heights. (R. at 121-22). According to Mr. Slive, this individual could not perform the plaintiff's past jobs but could work as a final assembler, stone setter, preparer, and charger. (R. at 122-23). Mr. Slive's assessment was the same for a second hypothetical individual who could understand, remember, and carryout simple routine unskilled work. (R. at 125). However, when Mr. Mercado's attorney added the further limitations of reaching in front with the dominant arm only occasionally or working only four hours a day, Mr. Slive testified that neither individual could do the previously identified jobs. (R. at 125, 128). The plaintiff's attorney also asked about neck flexion; Mr. Slive responded that bench work required looking down, but not moving the neck, constantly. (R. at 126-27).

The ALJ issued a decision denying Mr. Mercado's claim for

benefits on September 11, 2013 (R. at 70-84), which became final when the Appeals Council refused the plaintiff's request for review on January 20, 2015 (R. at 6-11).  The plaintiff commenced this action on March 26, 2015.

Analytical Framework

    A.   Determination of Disability

    A claimant is entitled to disability insurance benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (explaining that both impairment and inability to work must last twelve months), and which is demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3).  A claimant must also demonstrate that he was disabled as of a date on which he was still insured.  42 U.S.C. § 423(a)(1)(A); see also Fleming v. Astrue, No. 06 CV 20, 2010 WL 4554187, at *9 (E.D.N.Y. Nov. 2, 2010).

    In assessing a claim of disability, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4)

the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam)).  The regulations outline a five-step sequential process for evaluating a claim of disability.  20 C.F.R. § 404.1520; Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).  At each stage of the analysis and in making the findings on which his ultimate decision rests, the ALJ must adequately explain his reasoning and, in doing so, must address all pertinent evidence.  Delacruz v. Astrue, No. 10 Civ. 5749, 2011 WL 6425109, at *8 (S.D.N.Y. Dec. 1, 2011).

The ALJ must first verify that the claimant is not currently engaged in substantial gainful activity.  20 C.F.R. § 404.1520(b). Next, he determines whether the claimant has a medically severe impairment or combination of impairments.  20 C.F.R. § 404.1520(c). Third, if the impairment is included in the portion of the regulations known as "the Listings," 20 C.F.R. Part 404, Subpt. P, App. 1, or is the substantial equivalent of a listed impairment, the claimant is automatically considered disabled.  20 C.F.R. § 404.1520(a)(4)(iii), (d).  If not, the claimant must prove at step four that he does not have the residual functional capacity to perform his past work.  20 C.F.R. § 404.1520(a)(4)(iv), (e).

A claimant's residual functional capacity is "the most [he] can still do despite [his] limitations."  20 C.F.R. §

30

404.1545(a)(1).   To determine residual functional capacity, the ALJ identifies the claimant's functional limitations and assesses his work-related abilities on a function-by-function basis. Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam) (quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (July 2, 1996)).   The ALJ must also consider nonexertional factors that may further limit the claimant's ability to work. See SSR 96-8p, 1996 WL 374184, at *6.   If the claimant cannot perform his past relevant work, the burden shifts to the Commissioner to demonstrate at the fifth stage that there is alternative substantial gainful employment in the national economy that the claimant can perform.   20 C.F.R. § 404.1520(a)(4)(v), (g); Longbardi v. Astrue, No. 07 Civ. 5952, 2009 WL 50140, at *23 (S.D.N.Y. Jan. 7, 2009) (citing Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999), and Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986)).   When the claimant has significant nonexertional limitations, the ALJ must use a vocational expert or other similar evidence to satisfy this burden.   Bapp, 802 F.2d at 603.

    B.   Judicial Review

    Under Rule 12(c) of the Federal Rules of Civil Procedure, judgment on the pleadings is appropriate where the material facts are undisputed and a merits judgment may be reached merely by considering the contents of the pleadings.   Dargahi v. Honda Lease

31

Trust, 370 F. App'x 172, 174 (2d Cir. 2010).

The Social Security Act (the "Act") provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, a reviewing court does not determine de novo whether a plaintiff is disabled, but rather "is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012) (quoting Lamay v. Commissioner of Social Security, 562 F.3d 503, 507 (2d Cir. 2009)). "Substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "If substantial evidence supports the Commissioner's decision, then it must be upheld, even if substantial evidence also supports the contrary result." Ventura v. Barnhart, No. 04 Civ. 9018, 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006).

Although a reviewing court generally "defer[s] to the Commissioner's resolution of conflicting evidence," Cage v. Commissioner of Social Security, 692 F.3d 118, 122 (2d Cir. 2012), when assessing whether an agency determination is supported by substantial evidence it "is required to examine the entire record,

including contradictory evidence and evidence from which conflicting inferences can be drawn," Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (quoting Mongeur, 722 F.2d at 1038). A court must also independently ascertain that the correct standards were applied and remand when "there is a reasonable basis for doubt whether the ALJ applied correct legal principles." Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir. 1998) (explaining that, in such circumstances, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles"); see also Talanker v. Barnhart, 487 F. Supp. 2d 149, 154 (E.D.N.Y. 2007) ("An ALJ's failure to adhere to any of [the procedural obligations proscribed by regulation] constitutes legal error, permitting reversal of the administrative decision.").

Analysis

A.   The ALJ's Decision

After confirming that Mr. Mercado met the Act's insured status requirement, the ALJ proceeded through the five-step evaluation process. (R. at 70-84). At step one, he found that the plaintiff had not engaged in substantial gainful activity since January 19, 2011. (R. at 72). At step two, the ALJ identified the following severe impairments: "diabetes mellitus, cervical spine disc

33

bulging and herniation, lumbar spine bulging and mild stenosis, thoracic spine herniation, right internal derangement of the shoulder/frozen shoulder, obesity, right lateral epicondlitis, right bicep tendonitis, headaches[,] and depression." (R. at 72). However, after evaluating Mr. Mercardo's depression under listing 12.04,[35] the ALJ concluded that neither it nor any other impairment met or medically equaled a listed impairment in severity. (R. at 73-74).

At step four, the ALJ determined that Mr. Mercado was unable to perform his past relevant work, but was capable of performing a limited range of sedentary work. The ALJ found that the plaintiff could lift and carry up to ten pounds occasionally and items such as files or small tools frequently; sit for six hours during an eight-hour workday; stand and/or walk for a total of two hours; kneel, crouch, and crawl frequently; stoop occasionally; flex, rotate, and extend his neck frequently; climb ladders, ropes, and scaffolds occasionally (though he must avoid working at unprotected heights); use his right hand to handle and finger objects frequently, but never reach overhead; and understand,

---

[35] Listing 12.04 covers "Affective Disorders," which are "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." Appendix 1, Listing 12.04. To qualify under 12.04, the claimant's impairment must meet the criteria of either both paragraphs A and B or paragraph C. Id. Because he immediately discusses paragraph B, the ALJ presumably found the plaintiff to have satisfied paragraph A.

remember, and carry out simple routine unskilled work. (R. at 74).

In reaching this residual functional capacity determination, the ALJ assigned "some weight" to the "numerous opinion statements from Dr. Levinson"[36] and to "Dr. Linn's opinion regarding the claimant's disability status." (R. at 76-77). He explained that these opinions were "not binding" because they were "made for the purposes of workers' compensation," but also characterized his residual functional capacity determination as generally consistent with the doctors' conclusions. (R. at 76-77). However, he attached "less weight" to the opinion that Mr. Mercado could only work for half of a day because "scant evidence" supported such a restriction. (R. at 77).

The ALJ discounted the opinions of the plaintiff's other treating providers more significantly; he assigned "slight weight" to the neurologist, Dr. Jindal, and "little weight" to the endocrinologist, Dr. Villamon, and to the physical therapist, Mr. Elghazaly. (R. at 78, 80-81). In rejecting Dr. Jindal's assessment of total disability, the ALJ noted the absence of a

---

[36] As the defendant points out, the ALJ does not distinguish between Dr. Stephen Levinson and Dr. Marc Levinson, referring only to "Dr. Levinson." (Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to the Plaintiff's Motion for Judgment on the Pleadings ("Def. Memo.") at 21 n.8). I therefore refer to "Dr. Levinson" when quoting the ALJ's decision, but otherwise use the doctors' first initials or refer to "Drs. Levinson."

function by function assessment, and concluded that Dr. Jindal's progress notes and conservative treatment plan were "not supportive of finding that the claimant is precluded from all work." (R. at 78). He dismissed Dr. Villamon's conclusions as "general" and "not supported," and Mr. Elghazaly's limitations as "overly broad" and "not well supported" (R. at 80-81).

Rather than rely on Mr. Mercado's treating sources, the ALJ placed "great weight" on the opinions of the two independent medical examiners, Dr. Weiss-Citrome and Dr. Hughes, and the state agency physician, Dr. Friedman. (R. at 79-81). He explained that Dr. Weiss-Citrome and Dr. Hughes have "relevant specialt[ies]" and offered conclusions based on and consistent with a "comprehensive physical examination" of Mr. Mercado. (R. at 79-80). He pointed to Dr. Friedman's familiarity with SSA regulations and the fact that his residual functional capacity assessment was supported by a comprehensive review of the evidence. (R. at 80). The ALJ also mentioned, but rejected as unsupported, the four-hour workday limitation assessed by Dr. Krinick and Dr. Jones. (R. at 78-79).

The ALJ found that Mr. Mercado's medically determinable impairments could be expected to cause his alleged symptoms, but that his testimony regarding their intensity, persistence and limiting effects was "not wholly credible." (R. at 81). He noted that Mr. Mercado only required pain medication "for brief periods,"

did not suffer side effects, and received little benefit from other treatment. (R. at 81-82). He contrasted the plaintiff's testimony at the hearing with his previous statements about his ability to sit for long periods, dress and bathe himself, wash dishes, and go out twice a day. (R. at 82). The ALJ acknowledged Mr. Mercado's "excellent work history," but stated that it was "outweighed by various evaluations indicating that the claimant is not totally disabled." (R. at 82). Finally, he declared that Dr. Jones' finding of positive Waddell signs and Dr. Weiss-Citrome's observation that Mr. Mercado exaggerated his range of motion limitations "seriously undermine[d]" the plaintiff's credibility. (R. at 82).

Since the plaintiff's ability to perform sedentary work was further impeded by non-exertional limitations, the ALJ relied on vocational expert Donald Slive to identify jobs someone of Mr. Mercado's age, education, language skills, work experience, and residual functional capacity could perform. (R. at 83-84). The ALJ concluded that, because a significant number of such jobs existed in the national economy, Mr. Mercado had not been disabled at any time since January 19, 2011, through September 11, 2013. (R. at 84).

The plaintiff argues that the Commissioner's decision is erroneous as a matter of law and not supported by substantial

evidence.   Specifically, he alleges the ALJ erred by incorrectly evaluating the medical opinion evidence and the plaintiff's credibility, by inadequately developing the record, by failing to not incorporate all of the plaintiff's limitations in his residual functional capacity, and by relying on the vocational expert's responses to hypothetical questions that did not accurately reflect the plaintiff's abilities.   The Commissioner, on the other hand, argues that the ALJ applied the appropriate legal standards in evaluating the evidence and that his determination was supported by substantial evidence.

B.   <u>Evaluation of Medical Evidence</u>

The plaintiff's primary argument is that the ALJ erred when weighing the medical opinion evidence by improperly discounting the opinions of treating physicians Dr. Levinson, Dr. Jindal, and Dr. Villamon, and physical therapist Mr. Elghazaly.   (Plaintiff's Memorandum in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Memo.") at 17-18, 21-23).

The Social Security regulations lay out a framework for the evaluation of evidence pertaining to a claimant's ability to engage in work-related activities.   An ALJ must consider "every medical opinion" in the administrative record, "[r]egardless of its source."   20 C.F.R. § 404.1527(c).   However, the source of the opinion dictates the process by which it is weighed.   The

regulations distinguish between "acceptable medical sources," who can provide opinion evidence to establish whether a claimant has a medically determinable impairment, and "other sources," who can offer opinions regarding the severity of an impairment and how it affects the claimant's ability to work.  20 C.F.R. § 404.1513(a), (d).  The regulations also distinguish between treating, non-treating, and non-examining sources, 20 C.F.R. § 404.1502, and "provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker," SSR 96-6p, 1996 WL 374180, at *2.

     1.   <u>Treating Physician Rule</u>

Under the treating physician rule, "the opinion of a claimant's treating physician as to the nature or severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  <u>Burgess v. Astrue</u>, 537 F.3d 117, 128 (2d Cir. 2008) (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2)[37]).  "This preference is generally justified because treating sources are likely to be 'the medical professionals most able to provide a detailed, longitudinal

---

[37] In 2012, subsection (c) was removed and paragraphs (d) through (f) were redesignated as paragraphs (c) through (e).  <u>See</u> How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10651-01, 10656 (Feb. 23, 2012).

picture' of a plaintiff's medical impairments and offer a unique perspective that the medical tests and SSA consultants are unable to obtain or communicate." Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 426 (S.D.N.Y. 2010) (quoting 20 C.F.R. § 416.927(c)(2)); see also Burgess, 537 F.3d at 128 (explaining that "not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician").

Furthermore, "a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996). Even if a treating physician's opinion is not awarded controlling weight, it is "still entitled to deference." Id. The ALJ "must consider various 'factors' to determine how much weight to give the opinion," including: "(i) the frequency of examination and the length, nature[,] and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors." Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004)

(quoting 20 C.F.R. § 404.1527(c)(2)).  Explicit discussion of each factor is not required so long as it is clear that the ALJ undertook the proper analysis.  Id. at 32-33.  The ALJ must provide "good reasons" for not crediting the opinion, clearly specify the weight ultimately assigned, and sufficiently explain the rationale behind the weight determination.  20 C.F.R. § 404.1527(c)(2), (e)(2)(ii); see also Silva v. Colvin, No. 14-CV-6329, 2015 WL 5306005, at *5 (W.D.N.Y. Sept. 10, 2015) (explaining that failure to identify good reasons for discounting treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record" (emphasis omitted) (quoting Blakely v. Commissioner of Social Security, 581 F.3d 399, 407 (6th Cir. 2009))).

ALJ Gonzalez incorrectly applied these principles.  As an initial matter, he did not acknowledge the existence of the treating physician rule, let alone make express findings as to whether the opinions of the treating sources were entitled to controlling weight.  Even assuming he recognized Drs. Levinson, Linn, Jindal, and Villamon as treating physicians,[38] the ALJ failed to adequately consider the relevant factors when weighing their

---

[38] The Commissioner does not dispute that Drs. S. Levinson, M. Levinson, Villamon, Linn, and Jindal are treating physicians. (Def. Memo. at 20, 22).

41

opinions and did not provide good reasons for discrediting specific findings.

### i.   Drs. Levinson

The ALJ's treatment of the opinions of the two Drs. Levinson is riddled with errors.  As outlined above, an ALJ must first resolve whether a treating physician's opinion is entitled to controlling weight; then, if not affording the opinion controlling weight, the ALJ must ascertain the appropriate weight by balancing the factors enumerated in 20 C.F.R. § 404.1527(c)(2)(i)-(ii), (c)(3)-(6).  See Barnwell v. Colvin, No. 13 Civ. 3683, 2014 WL 4678259, at *9 (S.D.N.Y. Sept. 19, 2014) (describing assessment of a treating physician's opinion as "a two-step process").  However, ALJ Gonzalez's decision contains no evaluation of whether Drs. Levinson's opinions were supported by medically acceptable clinical and laboratory diagnostic techniques, or were inconsistent with other substantial evidence in the record.[39]  See

_____

[39] The Commissioner argues that Drs. Levinson's opinions (and those of Dr. Villamon and Mr. Elghazaly) were "contradicted by the substantial record evidence" (Def. Memo. at 20), but this is not clear from the ALJ's decision.  Cf. Petrie v. Astrue, 412 F. App'x 401, 407 (2d Cir. 2011) (stating that ALJ need not "have explained why he considered particular evidence unpersuasive or insufficient" so long as "the evidence of record permits [the court] to glean the rationale of an ALJ's decision"); Halloran, 362 F.3d at 31-32.  Moreover, the Commissioner does not support this assertion beyond stating that "it is the ALJ's, rather than the Court's, duty to weigh conflicting evidence, and even if there was substantial evidence to support a more restrictive [residual functional capacity] finding, the ALJ's decision must be upheld if supported by substantial evidence."  (Def. Memo. at 19).  While

Pereira v. Astrue, 279 F.R.D. 201, 208 (E.D.N.Y. 2010) (concluding that "ALJ failed to set forth a sufficient analysis" to support not affording treating source opinions controlling weight where he "did not identify the inconsistencies between the treating sources['] opinions and the other medical evidence in the record"). Bypassing the initial treating physician analysis altogether, the ALJ assigned "some" weight to Drs. Levinson and stated that the "opinion regarding the claimant's disability status was made for the purposes of workers' compensation." (R. at 76). This is a legally insufficient reason to categorically disregard a treating physician's opinion. While an assessment of disability for workers' compensation is not entitled to controlling weight, 20 C.F.R. §§ 404.1504, 404.1527(d)(1); see also SSR 06-03p, 2006 WL 2329939, at *6-7 (Aug. 9, 2006) (explaining that workers'

---

these propositions are correct in the abstract, see Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002), where an ALJ does not appear to have taken into consideration the factors required by the treating physician rule, the Court cannot find that the ALJ's determination is supported by substantial evidence, see Rolon v. Commissioner of Social Security, 994 F. Supp. 2d 496, 506 (S.D.N.Y. 2014) ("[I]n identifying and resolving [conflicts of evidence], the ALJ still must apply the treating physician rule."); cf. Sutherland v. Barnhart, 322 F. Supp. 2d 282, 290 (E.D.N.Y. 2004) (stating that ALJ must consider entire record and acknowledge conflicting evidence); Brown v. Barnhart, No. 01 CV 2962, 2002 WL 603044, at *3 (E.D.N.Y. April 15, 2002) ("[The treating physician rule] does not mean the treating physicians' opinions must be perfectly consistent with other evidence; rather, they must simply be 'not inconsistent' with other substantial record evidence."). As discussed below, ALJ Gonzalez's application of the treating physician rule fell short in this case.

compensation determinations are not binding because "different rules and standards" apply); SSR 96–5p, 1996 WL 374183, at *2 (July 2, 1996) ("[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance."), it "cannot be ignored," SSR 06-03p, 2006 WL 2329939, at *6; SSR 96–5p, 1996 WL 374183, at *2; see also Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) ("Reserving the ultimate issue of disability to the Commissioner . . . does not exempt administrative decisionmakers from their obligation . . . to explain why a treating physician's opinions are not being credited."); Colley v. Astrue, No. 1:06-CV-0749, 2009 WL 1392535, at *10 (N.D.N.Y. May 12, 2009) ("It would be illogical to hold that a treating physician's opinions are not entitled to weight simply because he had provided them in a workers' compensation context."). In other words, an ALJ must consider the medical opinions underlying and informing a treating physician's disability assessment. Ramos v. Commissioner of Social Security, No. 13 Civ. 3421, 2015 WL 7288658, at *6-7 (S.D.N.Y. Nov. 16, 2015); see also Otanez v. Colvin, No. 14 Civ. 8184, 2016 WL 128215, at *10 (S.D.N.Y. Jan. 12, 2016).[40]

---

[40] Nor does the fact that the ALJ's decision "accommodates many of Dr. Levinson's specific opined limitations" excuse him from considering all asserted restrictions in accordance with the treating physician rule. See Raymer v. Colvin, No. 14-CV-6009, 2015 WL 5032669P, at *5 (W.D.N.Y. Aug. 25, 2015) (explaining that an ALJ may weigh distinct portions of a medical opinion

44

Additionally, ALJ Gonzalez's conclusory assertion that "scant evidence" supported a four-hour workday restriction (R. at 76) does not countenance discrediting this limitation. Burgess, 537 F.3d at 129; see also Ashley v. Commissioner of Social Security, No. 5:14-CV-40, 2014 WL 7409594, at *2 (N.D.N.Y. Dec. 30, 2014) (ALJ's "conclusory statement" that treating records did not support source's conclusion "fail[ed] to fulfill the heightened duty of explanation" required by treating physician rule); Duncan v. Astrue, No. 09 CV 4462, 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011) (explaining that statements such as "not supported by the preponderance of the objective evidence of record" and "not consistent with the evidence on record" are not sufficiently good reasons for reducing weight assigned to treating physician's opinion). The ALJ did not explain why the record evidence was insufficient to support such a restriction.[41] Drs. S. and M. Levinson consistently recorded objective clinical findings of tenderness to palpation and limited range of motion of the right shoulder and the cervical and lumbosacral regions, as well as muscle spasms and trigger points (R. at 369-70, 375, 387, 390,

---

differently, but must sufficiently explain the decision to reject any specific finding).

[41] The Commissioner asserts that "the ALJ's decision makes clear why he thought there was 'scant' evidence (consisting of only a few opinions and a failed work attempt) to support [a four hour limitation]," but does not point to anything specific in the decision. (Def. Memo. at 21).

392, 397, 402-04, 408-10, 491-92, 496, 500, 504, 534, 537), which are corroborated by other providers' records (see, e.g., R. at 385 (Dr. Linn's findings of trigger points, spasm, tenderness, and decreased range of motion); R. at 421, 425, 458, 461, 490 (Dr. Jindal's findings of trigger points, tenderness, spasm, and decreased range of motion); R. at 528-29, 567-68 (Dr. Villamon's findings of tenderness, spasm, and decreased range of motion); R. at 543-45, 557-58 (Dr. Jones' findings of tenderness and decreased range of motion); R. at 451 (Dr. Krinick's findings of tenderness and decreased range of motion); R. at 552-53 (Dr. Hughes' findings of decreased range of motion); R. at 465-66 (Mr. Elghazaly's findings of tenderness, spasm, and decreased range of motion)). The ALJ's failure to discuss these objective medical findings makes it difficult to follow his reasoning when he stated that the medical records did not support the treating physicians' opinions. Additionally, both Dr. Krinick and Dr. Jones also assessed this restriction, and treatment notes reflect that Mr. Mercado briefly returned to work for four hours a day, but was unable to continue because of pain.  (R. at 397, 402-04, 408).

Moreover, an ALJ may not simply reject a treating physician's opinion as unsupported without adequately developing the record. Clark v. Commissioner of Social Security, 143 F.3d 115, 118 (2d Cir. 1998) (explaining that "lack of specific clinical findings in

the treating physician's report [does] not, standing by itself,
justify the ALJ's failure to credit the physician's opinion"); see
also Rocchio v. Astrue, No. 08 Civ. 3796, 2010 WL 5563842, at *11
(S.D.N.Y. Nov. 19, 2010) ("[A]n ALJ's duty to develop the record
[with respect to treating physicians' opinions] is 'all the more
important.'") (quoting Miller v. Barnhart, No. 03 Civ. 2072, 2004
WL 2434972, at *7 (S.D.N.Y. Nov. 1, 2004)), report and
recommendation adopted, 2011 WL 1197752 (S.D.N.Y. March 28,
2011).[42] Yet there is no evidence ALJ Gonzalez attempted to clarify
the basis for Drs. Levinson's opinions.

Finally, even if some of Drs. Levinson's opinions were not
entitled to controlling weight, the ALJ nonetheless inadequately
explained the weight ultimately afforded.  See Correale-Engelhart,
687 F. Supp. 2d at 431 (finding ALJ erred by not "follow[ing] the

---

[42] Although an ALJ no longer automatically commits legal error
by rejecting a medical assessment as unsupported or inconsistent
without re-contacting the medical source for further information,
see How We Collect and Consider Evidence of Disability, 77 Fed.
Reg. 10651 at 10655 (allowing ALJ to "determine the best way to
resolve the inconsistency or insufficiency"); cf. Calzada v.
Astrue, 753 F. Supp. 2d 250, 278 (S.D.N.Y. 2010), "courts in this
Circuit have held that when the information needed pertains to the
treating physician's opinion, the ALJ should reach out to that
treating source for clarification and additional evidence,"
Villarreal v. Colvin, No. 13 Civ. 6253, 2015 WL 6759503, at *21
(S.D.N.Y. Nov. 5, 2015) (collecting cases); see also Jimenez v.
Astrue, No. 12 Civ. 3477, 2013 WL 4400533, at *11 (S.D.N.Y. Aug.
14, 2013) (noting that despite 2013 amendments, "the regulations
still contemplate the ALJ recontacting treating physicians when
'the additional information needed is directly related to that
source's medical opinion'" (quoting How We Collect and Consider
Evidence of Disability, 77 Fed. Reg. at 10652)).

analytical path mandated by regulation"). He acknowledged that "Dr. Levinson saw the claimant on an almost monthly basis" for over two years (R. at 76), but never reconciled this treatment history with the decision to afford less than significant weight to Drs. Levinson's opinions. See Lopez v. Commissioner of Social Security, No. 08 CV 4787, 2009 WL 2922311, at *12 (E.D.N.Y. Sept. 8, 2009) (finding failure to discuss treatment relationship "particularly significant" with regard to physician who had "most substantial treatment relationship with plaintiff"). The ALJ also failed to mention the relevant specialization of Drs. Levinson and evidence supportive of their opinions, which, as previously noted, consisted of their own clinical findings as well as other physicians' opinions.

In sum, the ALJ disregarded the opinions of treating physicians with a relevant specialization and a lengthy treatment relationship with the plaintiff without attempting to develop the record fully and without providing the necessary good reasons to award their views less than controlling weight. Once the ALJ has sought out any additional information needed, he should reconsider whether Drs. Levinson's opinions are entitled to controlling weight, and, if he determines that they still are not, provide good reasons for that decision and the weight ultimately afforded.

ii.  Dr. Jindal

The ALJ's treatment of Dr. Jindal's opinions suffers from similar shortcomings.  Once again, the ALJ focused on the fact that they were offered in the workers' compensation context without sufficiently considering the underlying medical findings.  (R. at 78); see Blais v. Astrue, No. 08-CV-1223, 2010 WL 2400177, at *7 (N.D.N.Y. May 13, 2010), report and recommendation adopted sub nom., Blais v. Commissioner of Social Security Administration, 2010 WL 2400174 (N.D.N.Y. June 10, 2010).  Additionally, by faulting Dr. Jindal's reports for lacking function-by-function analyses (R. at 78), the ALJ relied on, rather than sought to fill, gaps in the record.  See Tornatore v. Barnhart, No. 05 Civ. 6858, 2006 WL 3714649, at *3 (S.D.N.Y. Dec. 12, 2006) ("The absence of an opinion about specific functions or limitations is a gap to be filled, not a reason to discredit or disregard [treating physician's] opinion.").

The ALJ further justified assigning Dr. Jindal's opinion only "slight weight" on the grounds that it was unsupported by and inconsistent with his "mostly normal" clinical findings and conservative treatment recommendations.  (R. at 78).  Yet this characterization reflects a selective reading of the record.  Dr. Jindal's reports contain numerous abnormal findings, including decreased sensation and range of motion.  (R. at 421, 425, 458,

49

461); see Agapito v. Colvin, No. 12 Civ. 2108, 2014 WL 774689, at
*2 (S.D.N.Y. Feb. 20, 2014).  While the ALJ briefly noted trigger
points, he did not mention Dr. Jindal's statement that pain
management and injections were "medically necessary considering
the [plaintiff's] clinical status" (R. at 490), instead
highlighting Mr. Mercado's normal muscle strength and gait and his
"atraumatic" head[43] (R. at 77).  An ALJ need not "mention[] every
item of testimony presented," Mongeur, 722 F.2d at 1040, however
he may not ignore or mischaracterize evidence, see Erickson v.
Commissioner of Social Security, 557 F.3d 79, 82-84 (2d Cir. 2009);
Kohler v. Astrue, 546 F.3d 260, 269 (2d Cir. 2008).  In forming
his own conclusions as to the import of Dr. Jindal's findings and
their inconsistency with a conclusion of total disability, ALJ
Gonzalez improperly substituted his "own assessment of the
relative merits of the objective evidence and subjective
complaints for that of the treating physician." Garcia v.
Barnhart, No. 01 Civ. 8300, 2003 WL 68040, at *7 (S.D.N.Y. Jan. 7,
2003).  Furthermore, it was incorrect to discount Dr. Jindal's

---

[43] Characterizing this finding as "notabl[e]" (R. at 77) was
particularly misleading, considering it merely reflects a head of
normal size and shape without evidence of trauma.  See Herbert L.
Fred, The Traditional (Paper) Hospital Record: Showplace for Bad
Habits, 39 Texas Heart Institute Journal 171, 172 (2012)
(describing notation as unnecessary because "most people have a
normal-appearing head without signs of injury"),
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3384064/.

opinion "merely because he [] recommended a conservative treatment regimen." Burgess, 537 F.3d at 129.

The ALJ's decision does not permit me to assess whether and to what extent he considered the requisite statutory factors when weighing Dr. Jindal's opinions.  Even if the characterization of Dr. Jindal's opinions as unsupported and inconsistent indicates the ALJ considered the consistency of Dr. Jindal's opinions when weighing them, it is not clear how any other factors impacted the determination.  Ramos, 2015 WL 7288658, at *6-7 (finding analysis that only considered opinion's consistency "inadequate" because it did not acknowledge treatment relationship, supportive evidence, or specialization); Clark v. Astrue, No. 08 Civ. 10389, 2010 WL 3036489, at *4 (S.D.N.Y. Aug. 4, 2010).  The failure to acknowledge Dr. Jindal's specialization in neurology and clinical neurophysiology is especially significant in light of the fact that the ALJ cited the neurology specialty of Dr. Hughes, an independent medical examiner, as a reason to afford his opinion "great weight." (R. at 80).  Accordingly, the ALJ's decision does not reflect that he applied the correct standards when considering Dr. Jindal's opinions.

### iii. Dr. Villamon

The ALJ's reasons for giving Dr. Villamon "little" weight also do not withstand scrutiny.  The decision pointed to no

evidence to support the conclusion that Dr. Villamon's opinion was based "on the claimant's subjective complaints" and Drs. Levinson's opinions, rather than "his own clinical and objective findings." (R. at 80).[44] Dr. Villamon recorded tenderness to palpation and decreased right arm, cervical, and lumbar ranges of motion.[45] (R. at 528-30, 567-70). Even if Dr. Villamon also considered Mr. Mercado's complaints or another doctor's opinion, it would be improper to fault him for doing so. See Burgess, 537 F.3d at 128 ("'[M]edically acceptable clinical and laboratory diagnostic techniques' include consideration of '[a] patient's report of complaints, or history, [a]s an essential diagnostic tool.'" (alterations in original) (quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003))); Nix v. Astrue, No. 07-CV-344, 2009 WL 3429616, at *9 (W.D.N.Y. Oct. 22, 2009); compare McCarthy v. Colvin, 66 F. Supp. 3d 315, 323-24 (W.D.N.Y. 2014) (finding ALJ "improperly disregard[ed]" treating physician's

---

[44] It is not evident from the treatment note the ALJ cited that Dr. Villamon's opinion was "secondary to Dr. Levinson's." (R. at 80 (citing R. at 529 ("He is 85% disable[d]. According to Dr. Levinson[,] orthopedics[,] he is at high risk for surgery[.] He has multiple herniated disc . . . .")))). Two notes in which Dr. Villamon characterized Mr. Mercado as "85% disabled" mention another physician; however, these references appear related to the advisability of surgery (R. at 529-30), and a third note contained no such reference (R. at 569).

[45] The regulations explicitly list "reduced joint motion" and "muscle spasm" as examples of objective medical evidence, 20 C.F.R. § 404.1529(c)(2); see also Cherico v. Colvin, No. 12 Civ. 5734, 2014 WL 3939036, at *25 (S.D.N.Y. Aug. 7, 2014).

opinion "as based 'largely' on plaintiff's subjective complaints" where opinion also contained "positive clinical findings" and doctor had a "long-standing treating relationship with plaintiff"), and Augustine v. Astrue, No. 11 CV 3886, 2012 WL 2700507, at *9 (E.D.N.Y. July 6, 2012) (explaining that although physician "relied in part on plaintiff's reported complaints of pain, his conclusions were also based on the medical record and his own observations"), with Stottlar v. Colvin, No. 5:13-CV-47, 2014 WL 3956628, at *16 (N.D.N.Y. Aug. 13, 2014) ("The ALJ's determination to give [consultative examiner's] opinion little weight was proper because the opinion was based entirely on Plaintiff's subjective statements and was inconsistent with the doctor's benign examination findings." (emphasis added)).  And if the ALJ wanted additional support, he should have sought clarification before rejecting the opinion.  Villarreal, 2015 WL 6759503, at *21.

Lastly, it is once again unclear whether the ALJ considered and appropriately balanced all the required treating physician factors.  He cited Dr. Villamon's expertise in "endocrinology, not [] orthopedic[s] or physical medicine or rehabilitation" as a reason to discount the opinion, but never discussed Dr. Villamon's treatment relationship with the plaintiff or his opinion's consistency with the record as a whole.  (R. at 80).  As a result,

53

it is not apparent that ALJ Gonzalez applied the substance of the treating physician rule to Dr. Viallamon.  See Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013).

> iv.  Mr. Elghazaly

The plaintiff claims that the ALJ also erred in according "little weight" to Mr. Elghazaly, his physical therapist.  (Pl. Memo. at 21-22; R. at 81).  While the Commissioner is correct that a physical therapist's opinion is not entitled to special deference (Def. Memo. at 20); see also Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir. 2008) (noting that opinions from "'other sources' . . . do not demand the same deference as those of a treating physician"); Corson v. Astrue, 601 F. Supp. 2d 515, 531-32 (W.D.N.Y. 2009) (observing that because "physical therapists' opinions are not medical opinions" under the regulations, they do not "require recognition and weight by the Commissioner equal to a medical doctor"), it is nevertheless "important and should be evaluated on key issues such as impairment severity and functional effects."  SSR 06-03p, 2006 WL 2329939, at *3; see also Phelps v. Colvin, No. 12-CV-976, 2014 WL 122189, at *3 (W.D.N.Y. Jan. 13, 2014).  When determining the weight to give sources such as physical therapists, an ALJ should apply the same factors used to evaluate acceptable medical source opinions.  SSR 06-03p, 2006 WL 2329939, at *3-5 (describing factors in 20 C.F.R. § 404.1527(d) as

"basic principles that apply to the consideration of all opinions" and stating that, in certain cases, their application may justify affording more weight to the opinion of an "other source" than to the opinion of an "acceptable medical source"); see also Delacruz, 2011 WL 6425109, at *17.  An ALJ has more discretion in assigning weight to these sources, but must still sufficiently explain his determination.  20 C.F.R. §§ 404.1513(d), 404.1527(c); SSR 06-3p, 2006 WL 2329939, at *6.  Yet ALJ Gonzalez repeated many of the errors discussed above, dismissing findings as unsupported without attempting to develop the record, discussing evidence selectively, and inadequately considering relevant factors.

The ALJ's characterization of Mr. Elghazay's opinion regarding the amount of time Mr. Mercado could stand, walk and sit as "unsupported by his clinical findings and [] even more limiting tha[n] the opinions of the claimant's physicians" and "the claimant's own reported abilities" is inaccurate and misleading. (R. at 81).  The ALJ neither suggested how Mr. Elghazaly's findings were insufficient nor attempted to clarify the basis for the therapist's conclusion that Mr. Mercado could stand, walk, and sit for "less than two hours total" in an eight-hour workday. Likewise, the ALJ offered no support for his comparative assessment of Mr. Elghazay's opinion.  Mr. Elghazaly was the only treating source to complete a physical residual functional capacity

questionnaire, and the only treating physician assessment of the plaintiff's ability to stand, walk, and sit -- expressed by Dr. M. Levinson in a 2011 treatment note -- limited these actions to "1-4 hours a day," a range that encompasses Mr. Elghazay's opinion. (R. at 438).    There are also several problems with the ALJ's reliance on Mr. Mercado's self-professed ability "to sit for long periods without pain."    (R. at 81).    An ALJ may consider inconsistencies between a medical source's opined limitations and the claimant's reported activities.    Fox v. Colvin, 589 F. App'x 35, 36 (2d Cir. 2015) (summary order); see also SSR 96-2p, 1996 WL 374188, at *3.  Here, however, ALJ Gonzalez relied on one imprecise statement -- "long periods of time" was never quantified -- without providing any context.    Cf. Selian, 708 F.3d at 421 (remanding case where ALJ improperly relied on "remarkably vague" opinion in which what examiner "mean[t] by 'mild degree' and 'intermittent' [wa]s left to the ALJ's sheer speculation").  For example, the ALJ did not mention that Mr. Mercado offered this report when comparing his ability to what he had reported the prior session, and did not discuss other portions of the examination narrative.[46]  (R. 465). Furthermore, the ALJ erred by ignoring multiple instances in which

---

[46] Nor did the ALJ attempt to get additional treatment notes from Mr. Elghazaly, which not only undermines his reliance on a comparative assessment offered in one of many appointments, but also indicates the record may not have been adequately developed. See Cabreja v. Colvin, No. 14 Civ. 4658, 2015 WL 6503824, at *27 (S.D.N.Y. Oct. 27, 2015).

the plaintiff articulated specific durational limitations greater than those assessed by Mr. Elghazay.  (See, e.g., R. at 118, 259); Ganoe v. Commissioner of Social Security, No. 5:14-CV-1396, 2015 WL 9267442, at *5 (N.D.N.Y. Nov. 23, 2015) (finding it improper to discredit physician's opinion as inconsistent with plaintiff's reported activities without considering that plaintiff also testified to limitations regarding those activities).

The ALJ's lack of analysis is particularly problematic because Mr. Elghazaly treated the plaintiff with respect to the specific impairments at issue over an extended period of time and was the only treating source to submit a comprehensive residual functional capacity questionnaire.  On remand, the ALJ should evaluate Mr. Elghazaly's opinions, as well as any new reports provided in response to a request for further information, in accordance with the principles set forth by the regulations.

### 2.   Weighing Other Medical Opinions

The plaintiff contends that, in addition to improperly discounting the opinions of his treating sources, ALJ Gonzalez erred in assigning "great weight" to the opinions of the independent medical examiners, Dr. Weiss-Citrome and Dr. Hughes, and the SSA analyst, Dr. Friedman.  (Pl. Memo. at 22-23).  While it is not legal error per se to assign greater weight to a non-treating physician than to a treating physician, see Rosier v.

Colvin, 586 F. App'x 756, 758 (2d Cir. 2014) (summary order); SSR
No. 96-6p, 1996 WL 374180, at *3, such a decision must be based
upon proper consideration of relevant factors and sufficiently
explained, see 20 C.F.R. § 404.1527(c)(1)-(6), (e)(2)(ii)
(requiring explanation of weight determination); Peryea v.
Commissioner of Social Security, No. 5:13-CV-173, 2014 WL 4105296,
at *8 (N.D.N.Y. Aug. 20, 2014) ("[Consulting] opinions must be
evaluated according to the criteria governing all medical
opinions."); see also Cortright v. Colvin, No. 13 Civ. 5422, 2014
WL 4384110, at *13 (S.D.N.Y. Aug. 29, 2014) (emphasizing importance
of justifying reliance on consulting physicians' opinions that
"conflict with the claimant's own reported level of functioning
and the opinions of the treating physicians").

I agree that ALJ Gonzalez failed to adequately explain why
the opinions of Drs. Weiss-Citrome, Hughes, and Friedman
outweighed those of Mr. Mercado's treating sources.  The factors
the ALJ cited could have equally supported treating physician
opinions he discounted.  He highlighted Dr. Weiss-Citrome's
expertise in physical medicine and rehabilitation and Dr. Hughes'
specialty in neurology, but, inexplicably, did not mention that
Drs. Levinson specialized in physical medicine and rehabilitation
or that Dr. Jindal was Board certified in neurology, clinical
neurophysiology, and pain medicine. (R. at 76-80, 335, 425).  And

not only did the ALJ credit Drs. Weiss-Citrome and Hughes for "personally examin[ing] the claimant" (R. at 79-80) -- something all of Mr. Mercado's treating providers did -- he also failed to acknowledge the fact that Dr. Friedman never did.   This incongruous, selective, and outcome-determinative discussion of relevant factors frustrates any side-by-side assessment of the medical opinions.   See Ellington v. Astrue, 641 F. Supp. 2d 322, 331 (S.D.N.Y. 2009) (stating ALJ "was obligated to give a more complete explanation as to why the balance of factors pointed against [treating physician's] conclusions").

The ALJ's decision to give the opinions of Drs. Weiss-Citrome, Hughes, and Friedman "great weight" seems to rest on his favorable perception of their opinions.   (See R. at 79-81).   However, he insufficiently analyzed inconsistencies between their opinions and those of Mr. Mercado's treating physicians.   See McCarthy v. Astrue, No. 07 Civ. 300, 2007 WL 4444976, at *6 (S.D.N.Y. Dec. 18, 2007) (requiring ALJ to reconsider on remand whether treating physicians' opinions were entitled to controlling weight where, despite assessing plaintiff's abilities differently, "treating and examining physicians were in agreement about the central aspect of [the plaintiff's] condition"); Bussi, 2003 WL 21283448, at *7 (finding treating physician's opinion was consistent with record despite differing from consultant's assessment of claimant's

59

ability to "kneel, bend, or squat"); cf. Moore v. Astrue, No. 07 CV 5207, 2009 WL 2581718, at *10 n.22 (E.D.N.Y. Aug. 21, 2009) ("[A]n inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of the treating physician."); Harris v. Astrue, No. 07 CV 4554, 2009 WL 2386039, at *14 (E.D.N.Y. July 31, 2009) ("The Second Circuit has repeatedly stated that when there are conflicting opinions between the treating and consulting sources, the 'consulting physician's opinions or report should be given limited weight.'" (quoting Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990))).  Furthermore, the ALJ's failure to apply the same level of scrutiny to the consultative doctors' opinions as he applied to Mr. Mercado's treating sources' opinions -- let alone the greater scrutiny called for by the regulations, see 20 C.F.R. § 404.1527; SSR 96-6p, 1996 WL 374180, at *2 -- undermines his analysis.  On remand, the ALJ should reevaluate the consulting physicians' opinions after properly weighing the treating sources' opinions, including the new evidence submitted to the Appeals Council.[47]   He is reminded

---

[47] Although the opinions of Dr. Bachar were not before the ALJ, they are now part of the record and should be considered on remand.  See Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  It is therefore unnecessary to address the plaintiff's argument that this evidence, on its own, warrants remand (Pl. Memo. at 23) except to note that, contrary to the defendant's suggestion (Def. Memo. at 22), medical evidence is not immaterial merely because it post-dates the ALJ's decision.  See Pollard v. Halter, 377 F.3d 183, 193-94 (2d Cir. 2004).

that, in doing so, consulting physicians' opinions are usually entitled to less weight than those of treating physicians, and a non-examining physician's opinion is generally entitled to the least weight of all.

## C. Credibility Determination

The plaintiff also challenges the ALJ's credibility determination. (Pl. Memo. at 23-24). The ALJ must revisit the plaintiff's credibility after properly evaluating the medical evidence, see Garner v. Colvin, No. 13 Civ. 4358, 2014 WL 2936018, at *10 (S.D.N.Y. June 27, 2014) (explaining that credibility "can only be properly assessed after the correct application of the treating physician rule"), and I make the following additional observations to ensure it is correctly assessed on remand.

Although ALJ Gonzalez referenced the factors the regulations identify as relevant to a credibility assessment, 20 C.F.R. § 404.1529(c)(3)(i)-(vii), he inaccurately construed the plaintiff's testimony and the medical evidence, see Meadors v. Astrue, 370 F. App'x 179, 185 n.2 (2d Cir. 2010) (stating ALJ "cannot simply selectively choose evidence in the record that supports his conclusions" or "mis-characterize a claimant's testimony or afford inordinate weight to a single factor" (quoting Gecevic v. Secretary of Health and Human Services, 882 F. Supp. 278, 286 (E.D.N.Y. 1995))). For example, while the ALJ pointed to a lack of "evidence

61

of adverse side effects to medication," he neither mentioned that the plaintiff reported receiving only minimal and fleeting relief from a variety of potent painkillers, nor explained how the fact that physical therapy and injections failed to provide the plaintiff relief detracted from his credibility.  (R. at 82); see Archambault v. Astrue, No. 09 Civ. 6363, 2010 WL 5829378, at *33-34 (S.D.N.Y. Dec. 13, 2010) (holding that plaintiff's use of narcotic pain medication supported credibility of his subjective testimony concerning his pain and was inconsistent with ALJ's conclusion that plaintiff's pain was less severe than claimed), report and recommendation adopted, 2011 WL 649665 (S.D.N.Y. Feb. 17, 2011).

The ALJ also erred in concluding that the plaintiff's self-professed ability to "sit for long periods of time without pain" and his ability "to independently get dressed and bathe, though with some limitations in his ability to lift his right shoulder, wash dishes[,] and go out twice a day" undermined his testimony of "seriously impaired activities of daily living." (R. at 82).  In reaching this conclusion, the ALJ again overstated the significance of Mr. Mercado's statement to Mr. Elghazaly.  He also ignored the consistency of Mr. Mercado's complaints (see, e.g., R. at 368, 375, 387, 390, 392, 397, 402-04, 408-10, 425, 458, 461, 470, 490, 514-15, 519, 523, 527, 534, 537) and the extent to which

Mr. Mercado qualified his limited abilities (see, e.g., R. at 118, 259); see also SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996) ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."); accord Matejka v. Barnhart, 386 F. Supp. 2d 198, 207 (W.D.N.Y. 2005) (finding err with credibility assessment where ALJ "failed to consider that plaintiff's claim of disability was consistent" with information he provided to physicians and physical therapist).  Furthermore, the ALJ did not explain how the performance of these limited activities were inconsistent with the plaintiff's complaints.  See Molina v. Colvin, No. 13 Civ. 4989, 2014 WL 3445335, at *15 (S.D.N.Y. July 15, 2014) ("There is a big difference [] between an occasional walk or shopping trip and sitting/standing for an eight hour workday."); Woodford v. Apfel, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) (explaining that a claimant's mere performance of basic self-care activities does not contradict allegations of disability).

The ALJ cited the discrepancy in range of motion observed by Dr. Weiss-Citrome and Dr. Jones' positive Waddell's finding as significant reasons to disbelieve the severity of the plaintiff's alleged symptoms.  (R. at 82).  While evidence of symptom exaggeration certainly detracts from a claimant's credibility, I am concerned by the ALJ's cursory, and seemingly selective,

analysis.   First, Dr. Jones noted "slightly positive" Waddell's testing in the lower back -- but not in the right shoulder or cervical spine, where the plaintiff also had pain and limited range of motion.  (R. at 544 (emphasis added)).  Second, the ALJ offered no explanation as to why he credited this assessment, while otherwise affording Dr. Jones' opinions -- the majority of which supported a finding of disability -- only "slight" weight.  (R. at 79); see Shaw v. Chater, 221 F.3d 126, 135 (2d Cir. 2000) (finding ALJ's inconsistent use of medical evidence undermined his evaluation of that evidence's reliability).  Finally, ALJ Gonzalez ignored the fact that none of Mr. Mercado's treating doctors suggested he magnified or exaggerated his symptoms.  Proper v. Commissioner of Social Security, No. 12-CV-0098, 2014 WL 7271650, at *14 (W.D.N.Y. Dec. 18, 2014); see also Orellana v. Colvin, No. 14 CV 6812, 2015 WL 5918314, at *8 (E.D.N.Y. Oct. 9, 2015) (concluding that ALJ improperly relied on report of consultant who "made no positive clinical findings, and opined that [the claimant] was exaggerating the intensity of his symptoms"); Delacruz, 2011 WL 6425109, at *18-20 (finding credibility analysis "inadequate," in part because ALJ relied on consultant's observation of symptom exaggeration rather than treating physician's opinion that supported plaintiff's testimony regarding her pain).

Accordingly, on remand the ALJ is instructed to reassess the plaintiff's credibility after revaluating the medical opinion evidence and, in doing so, sufficiently explain how the evidence as a whole supports a finding of symptom exaggeration sufficient to negate the plaintiff's credibility.

D.   Residual Functional Capacity

Because remand is warranted for other reasons, I do not address the plaintiff's further challenges to the ALJ's residual functional capacity determination (Pl. Memo. at 17-20) beyond making the following observations regarding (1) the need for a function-by-function analysis and (2) the ALJ's duty to develop the record with respect to relevant functional abilities.

In making a residual functional capacity assessment, an ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," SSR 96-8p, 1996 WL 374184, at *1, though failure to articulate a specific function-by-function residual functional capacity is not error per se, Cichocki, 729 F.3d at 177.  "Remand may be appropriate, however, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review."  Id.  This is precisely the error committed here.  In the

65

face of evidence indicating Mr. Mercado was limited with respect to prolonged sitting, standing, and walking, as well as flexing his neck, stooping, handling, fingering, and working for more than four hours a day, the ALJ's inadequate assessment of these functional capacities precludes review of whether his residual functional capacity determination was supported by substantial evidence. See id.; see also Box v. Colvin, 3 F. Supp. 3d 27, 46 (E.D.N.Y. 2014) (remanding where ALJ failed to address plaintiff's abilities with respect to specific relevant functions and failed to address conflict of opinions); Glessing v. Commissioner of Social Security, No. 13 CV 1254, 2014 WL 1599944, at *9 (E.D.N.Y. April 21, 2014) (stating ALJ was required to analyze relevant limitations, "particularly those for which there was conflicting medical evidence in the record"); Tricic v. Astrue, No. 6:07-CV-9997, 2010 WL 3338697, at *4 (N.D.N.Y. Aug. 24, 2010) (finding plaintiff's ability to crouch, kneel, crawl, stoop, and climb stairs occasionally was not supported by substantial evidence where medical consultant opined plaintiff could perform activities occasionally and two independent medical examiners assessed no restrictions, but the record contained no other medical opinion evidence regarding these specific limitations); Caserto v. Barnhart, 309 F. Supp. 2d 435, 445-46 (E.D.N.Y. 2004) (remanding, in part, where ALJ failed to reconcile conflicting residual

functional capacity determinations made by treating and consulting physicians and failed to specify why consultant's conclusion was entitled to more weight than that of treating physician). Furthermore, the conflicting medical evidence in this case was highly relevant to the ALJ's determination of Mr. Mercado's residual functional capacity. See, e.g., SSR 96-9p, 1996 WL 374185, at *3 (July 2, 1996) (noting sedentary work requires ability to sit for approximately six out of eight hours, and that frequently alternating between standing and sitting may not be within the meaning of sedentary work).

The ALJ should seek further information to the extent it is needed for a comprehensive assessment of Mr. Mercado's abilities with respect to these functions. Casino-Ortiz v. Astrue, No. 06 Civ. 155, 2007 WL 2745704, *7 (S.D.N.Y. Sept. 21, 2007) ("The record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity."). It is well settled that an ALJ has an affirmative duty to develop the medical record, even for claimants represented by counsel, and to seek out further information where evidentiary gaps exist, or where the evidence is inconsistent or contradictory, see, e.g. Lowry v. Astrue, 474 F. App'x 801, 804 (2d Cir. 2012) (summary order), and failure to do so is grounds for remand, Moran v. Astrue, 569 F.3d 108, 114-15 (2d Cir. 2009) ("We vacate not

because the ALJ's decision was not supported by substantial evidence but because the ALJ should have developed a more comprehensive record before making his decision.").

Although the defendant is correct that, absent "obvious gaps" in the administrative record, an ALJ who "possesses a complete medical history . . . is under no obligation to seek additional information in advance of rejecting a benefits claim," Lowry, 474 F. App'x at 804 (quoting Rosa, 168 F.3d at 79 n.5); (Def. Memo. at 21-22), there are numerous indications in the record and in the ALJ's decision that Mr. Mercado's medical history was insufficiently developed.  As previously discussed, ALJ Gonzalez characterized numerous treating source opinions, including those of Drs. Levinson, Dr. Jindal, Dr. Villamon, and Mr. Elghazaly, as unsupported or inconsistent (R. at 77-78, 80-81) and erred by discounting these opinions without first attempting to remedy the perceived deficits.  Furthermore, the record contains no residual functional capacity assessment by a treating or examining physician, nor is there any evidence that the ALJ requested such assessments.  See Kunkel v. Commissioner of Social Security, No. 12-CV-6478, 2013 WL 4495008, at *16-18 (W.D.N.Y. Aug. 20, 2013) (explaining that "an ALJ's failure in his duty to request [a residual functional capacity] assessment from a treating physician [does not] necessarily or automatically require[] a remand," but

noting "it is unusual for the record not to contain [a residual functional capacity] assessment from the primary treating physician").   On remand, the ALJ should solicit a functional assessment from a treating or examining physician to ensure there is a sufficient basis for determining the plaintiff's exertional and non-exertional capabilities.[48]

F.   Remedy

Even though I reverse the Commissioner's decision, I will not direct judgment for the plaintiff.   Under 42 U.S.C. § 405(g), a reviewing court has the power to affirm, modify, or reverse an ALJ's decision with or without remanding the case for a rehearing. Remand is appropriate where "there are gaps in the administrative record or the ALJ has applied an improper legal standard."   Rosa, 168 F.3d at 82-83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)).   Only when a court finds "no apparent basis to conclude that a more complete record might support the Commissioner's decision" is remand solely for a calculation of benefits warranted.   Id. at 83.   Although ALJ Gonzalez's errors here mandate remand, Mr. Mercado has not demonstrated that the record so clearly supports his claim of disability such that

_____

[48] Because the step four determination may change on remand, I do not consider the plaintiff's argument that the Commissioner did not meet her burden of proof at step five of the sequential evaluation because the ALJ incorporated an erroneous residual functional capacity determination into the hypotheticals presented to the vocational expert.

further consideration of the issue would serve no purpose. See, e.g., Butts v. Barnhart, 388 F.3d 377, 385-86 (2d Cir. 2004).

On remand, the ALJ is directed to: (1) fully develop the administrative record; (2) evaluate the medical opinion evidence -- including the additional records Mr. Mercado submitted to the Appeals Council -- consistent with the treating physician rule; (3) reassess the plaintiff's credibility; (4) set forth a residual functional capacity determination accounting for all of the plaintiff's limitations and sufficiently explain that determination; and (5) base his step-five analysis on the properly-determined a residual functional capacity.

Conclusion

For the foregoing reasons, the plaintiff's motion for judgment on the pleadings (Docket no. 15) is granted, the Commissioner's motion for judgment on the pleadings (Docket no. 17) is denied, and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this opinion.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:     New York, New York
           July 13, 2016


Copies transmitted this date to:

Irwin M. Portnoy, Esq.
Irwin M. Portnoy & Assoc., P.C.
542 Union Ave.
New Windsor, NY 12553

Carolyn A. Kubitschek, Esq.
Lansner & Kubitschek
325 Broadway, Suite 201
New York, NY 10007

Allison Rovner, Esq.
Assistant United States Attorney
867 Chambers St., 3rd Floor
New York, NY 10007